1  SCOTT N. SCHOOLS (SC 9990)
   United States Attorney
2
   DOUG SPRAGUE (CSBN 202121)
3  Acting Chief, Criminal Division

4  PETER B. AXELROD (CSBN 190843)
   Assistant U.S. Attorney
5
      450 Golden Gate Ave (11th Floor)
6     San Francisco, CA 94102
      Telephone: (415) 436-7200
7     Facsimile: (415) 436-7234
      E-Mail: Peter.Axelrod@usdoj.gov
8
   Attorneys for the United States
9
                    UNITED STATES DISTRICT COURT
10
                   NORTHERN DISTRICT OF CALIFORNIA
11
                         SAN FRANCISCO DIVISION
12

FILED
JUN 2 5 2007
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

13  UNITED STATES OF AMERICA,       )    CRIMINAL NO.  3-07 70368
                                    )                         BZ
14       Plaintiff,                 )
                                    )    NOTICE OF PROCEEDINGS ON
15       v.                         )    OUT-OF-DISTRICT CRIMINAL
                                    )    CHARGES PURSUANT TO RULES
16  JUSTIN DANIEL MEDLIN,           )    5(c)(2) AND (3) OF THE FEDERAL RULES
                                    )    OF CRIMINAL PROCEDURE
17       Defendant.                 )
                                    )
18  _____)

19       Please take notice pursuant to Rules 5(c)(2) and (3) of the Federal Rules of Criminal

20  Procedure that on June 25, 2007, the above-named defendant was arrested based upon an arrest

21  warrant (copy attached) issued upon an

22       ☐ Indictment

23       ☐ Information

24       ☑ Criminal Complaint

25       ☐ Other (describe) _____

26  pending in the Eastern District of Virginia, Case Number 06mj883.

27

28

                                        1

AO 91 (Rev. 5/85) Criminal Complaint

**UNDER SEAL**

# United States District Court

EASTERN    DISTRICT OF    VIRGINIA

FILED OCT 2 5 2006

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA

v.                                              **CRIMINAL COMPLAINT**

**JUSTIN DANIEL MEDLIN**

CASE NUMBER: 1:06mj883

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __July 2004__ in __Fairfax__ County, in the __Eastern__ District of __Virginia__ defendant(s) did, (Track Statutory Language of Offense)

FRAUD IN CONNECTION WITH E-MAIL, AND MONEY LAUNDERING

in violation of Title __18__ United States Code, Section(s) __1037 and 1956__.

I further state that I am a(n) __Special Agent__ and that this complaint is based on the following facts:
Official Title

**SEE ATTACHED AFFIDAVIT**

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

Signature of Complainant
Mark DiGiovanni
Postal Inspector
U.S. Postal Inspection Service

AUSA- John Eisinger

Sworn to before me and subscribed in my presence,

October 25, 2006                at      Alexandria, Virginia
Date                                     City and State

The Honorable Barry R. Poretz          Signature of Judicial Officer
United States Magistrate Judge



UNDER SEAL

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No: 1:06mj883 |
| v. ) | |
| ) | **UNDER SEAL** |
| JUSTIN MEDLIN, ) | |

FILED OCT 2 5 2006 CLERK, U.S. DISTRICT COURT ALEXANDRIA, VIRGINIA

### Affidavit in Support of a Criminal Complaint

I, MARK J. DIGIOVANNI, United States Postal Inspector, Merrifield, Virginia, being duly sworn, deposes and states as follows:

#### Introduction

1. I am a postal inspector for the United States Postal Inspection Service, assigned to the Washington Division, Merrifield, Virginia domicile. I have been employed as postal inspector since 1990. My current duties involve conducting criminal financial investigations to include violations related to mail fraud, wire fraud and money laundering, among other federal criminal statutes.

2. The facts and information contained in this affidavit are based on my personal knowledge and observations; my review of records and documents obtained during this investigation, including but not limited to, information obtained from financial documents, and other reports and documents; information received from other individuals, including cooperating witnesses, employees of the United States Securities and Exchange Commission ("SEC") and the National Association of Securities Dealers ("NASD"); other law enforcement officers; and information gained through my training and experience.

3. This affidavit does not set forth all information known by me about this case and is being submitted solely for the purpose of providing sufficient information to establish probable cause to support an application for a criminal complaint and arrest warrant charging Justin Daniel Medlin (hereinafter "MEDLIN") with fraud and related activity in connection with electronic mail in violation of Title 18 of United States Code, Section 1037(a)(1)-(3) and money laundering in violation of Title 18 of United States Code, Section 1956(a)(1)(B).

Background of Pump and Dump Stock Manipulation Scheme

4. Along with special agents of the Federal Bureau of Investigation, I am investigating a group of individuals who engaged in a conspiracy to defraud the investing public through the use of stock manipulation schemes, also referred to as pump and dump schemes. The group included stock brokers, former stock brokers, stock promoters, stock transfer agents, attorneys and others. The general purpose of the conspiracy and scheme to defraud was for its members to financially enrich themselves by engaging in pump and dump schemes in which they fraudulently created artificial demand for certain over-the-counter securities (the "pump") by, among other means, sending out unsolicited commercial spam e-mail containing misrepresentations about those securities, so that they could sell shares of those securities that they owned or controlled to the investing public at an artificially inflated price (the "dump").

5. In August 2004, I received a referral from the NASD regarding a fraudulent scheme to manipulate the trading volume and stock price of Emerging Holdings, Inc. ("EMRH"). EMRH's principal office was located in Reston, VA. The owner of EMRH, in conjunction with other co-conspirators, arranged for EMRH to be publicly traded on the Pink Sheets under the stock ticker symbol "EMRH." The Pink Sheets is a service that provides quotations, prices, and financial information for certain over-the-counter securities. An SEC investigation into EMRH disclosed that the company had no assets, revenue, or business operations. Additionally, the SEC investigation revealed that some of the victim investors resided in the Eastern District of Virginia.

6. A cooperating witness (hereinafter referred to as "CW3" and who is discussed in greater detail in paragraph 9 below) informed me that EMRH was the subject of a pump and dump scheme. The scheme, which occurred from in or about June 2004 to August 2004, involved sending unsolicited spam e-mail to prospective investors nationwide. The spam e-mail contained false and misleading representations concerning EMRH's business prospects, including bogus short and long-term price targets for the company's stock. CW3 told me that the spam e-mail campaign was strategically launched over the weekend of July 10-11, 2004 to coincide with the company's purported initial public offering scheduled for July 12, 2004. The spam e-mails were sent primarily to e-mail accounts registered with America Online ("AOL"), whose servers are located in the Eastern District of Virginia. CW3 told me the spam e-mail was distributed by an individual named Justin MEDLIN.

7. The spam e-mail campaign, in conjunction with other promotional activities, led to an immediate and significant increase in the trading volume and price of EMRH shares. For example, between July 12, 2004 and July 19, 2004, the stock price increased from $1.00 to $1.36, reaching a high of $1.76 by July 13, the second day of trading. Trading volume was also high, reaching 3 million shares on July 12, 2004. After successfully pumping the price of EMRH stock, CW3 and his/her co-conspirators profited by "dumping" shares of the stock that they controlled into the artificially inflated market that they created. Unsuspecting investors purchased these shares, which

2

eventually became worthless. In total, members of the scheme realized in excess of $2.8 million in artificial trading profits as a result of the sale of EMRH stock.

8. As I learned from CW3, during roughly the same period of time as EMRH, the securities of three additional companies, also publicly traded on the Pink Sheets, were pumped and dumped in the same manner as EMRH. An SEC attorney informed me that these companies, eDollars, MassClick and China Score, had no assets, revenue, or business operations, but were touted, i.e., pumped, to the investing public in the same manner as EMRH. I was told by CW3 that MEDLIN was hired to distribute spam e-mail in connection with the promotion of these stocks as well.

## Cooperating Witness

9. During the course of this investigation, I have worked closely with CW3. CW3 was a participant in the pump and dump schemes to manipulate the stock of Emerging Holdings, eDollars, MassClick, and China Score as explained in paragraphs 5-8 above. CW3 has agreed to cooperate with law enforcement and, since November 2005, has been providing reliable information regarding MEDLIN, and others. Despite the fact they have never met in person, for the past several years CW3 and MEDLIN have communicated extensively through e-mail and instant messaging. Reportedly, their relationship began in 2002, at which time MEDLIN began distributing spam e-mail in connection with retail products then being marketed by CW3, including bootleg computer software.

## The Fraudulent Spam E-Mail Campaign

10. As part of his cooperation, CW3 has provided me with photocopies of many documents including spam e-mail distributed by MEDLIN in connection with the promotion of the securities of, among others, eDollars, Emerging Holdings, China Score and Massclick. I was told by CW3 that the text contained in the spam e-mail typically was written by a co-conspirator in the form of a Microsoft Word document referred to as a "creative." Once written, the creative was e-mailed by the co-conspirator to CW3, who in turn converted it into hyper text markup language (HTML) format and then forwarded it by e-mail to MEDLIN. CW3 told me that MEDLIN would edit the creative as necessary in order to circumvent AOL anti-spam filters and to "spruce it up" to attract investor interest in the securities.

11. I learned through CW3 that MEDLIN intentionally transmitted multiple e-mail messages via the Internet to AOL subscribers in which he had materially altered the header information of the spam e-mails by creating false relay information and using fictitious names and e-mail address in the "from" and "to" fields. MEDLIN falsified header information in an attempt to disguise the spam e-mails' true origin (i.e. the computer locations from which he was initiating his emailing operations) and in order to bypass AOL's spam filters. CW3 told me that MEDLIN claimed to possess in excess of 30 million AOL subscriber e-mail addresses. CW3 further told me that MEDLIN had been sued by AOL in connection with the distribution of spam e-mail and that AOL officials had seized MEDLIN's Porsche automobile and money from his bank account.

3

12. As explained to me by AOL officials, who have examined examples of the spam, that to effectuate his illegal spam e-mail scheme MEDLIN obtained control of a large number of compromised PC's ("robots" or "bots"). The bots were personal and business computers connected to the Internet that were infected with malicious software that allowed MEDLIN to control the PC's remotely without the knowledge or authorization of the computers' owners.

13. MEDLIN gained access to the bots without authorization, and intentionally initiated the transmission of unsolicited bulk e-mail ("UBE") from the bots to servers on the Internet that were running a program called formmail.pl. Formmail.pl is a script that allows the user of a website to send e-mail from the webserver. Normally this script is used to send a copy of an article or page from the website to a friend or acquaintance. However, if the script is not configured properly, it can be exploited by a spammer to send thousands of pieces of SPAM anonymously. AOL officials produced complaint counts for the spam e-mail campaigns which touted the stocks of EMRH and MSCK. For the period of July 12, 2004 through August 16, 2004, AOL received 976,133 member complaints regarding the receipt of unsolicited UBE touting the stock of EMRH. From July 31, 2004 through August 26, 2004, member complaints regarding MSCK totaled 1,010,787.

14. According to AOL officials, MEDLIN used a program to find websites that were running a misconfigured copy of formmail.pl. The program would then take blocks of several thousand e-mail addresses provided by MEDLIN and enter those addresses into the "blind carbon copy" field of the UBE. This would allow MEDLIN to use Internet servers to relay or transmit thousands of messages at a time, with the intent to deceive users and Internet Service Providers as to the origins and recipients of the e-mail. The program would then enter random names and domain names into the "from" and "to" fields. MEDLIN was not the registered owner of any of the domains listed in the "from" or "to" fields. Finally, the program would enter text supplied by MEDLIN to be placed in the message text and send the messages through the misconfigured formmial.pl script on the webserver.

15. By using bots and misconfigured scripts on Internet web servers, MEDLIN was able to disguise the true origin of the UBE. The person receiving the UBE would only see the address of the webserver. The webserver operator would only see the address of compromised PC's. The compromised PC's would not have any logs to show how or from where they were compromised.

16. I learned that MEDLIN was one of several defendants named in a 2003 lawsuit brought by AOL and filed in the United States District Court for the Eastern District of Virginia. The case involved the unauthorized transmission of UBE by MEDLIN and others to AOL members. MEDLIN was represented in the matter by California attorney Marc Primo. Collectively, the defendants were alleged to have distributed millions of UBE advertising or promoting pornography, college degrees, bootleg computer software and other retail products. In court documents MEDLIN admitted receiving in excess of $1.1 million from his role in the scheme.

17. In December 2003, MEDLIN and AOL entered into a confidential settlement agreement, the terms of which required MEDLIN to make a cash payment plus transfer possession of his 2002 Porsche Boxster automobile to AOL. The automobile was later the focus of an AOL-sponsored online raffle. I read MEDLIN's deposition as well as his written responses to the plaintiff's interrogatories. Representations made by MEDLIN included the following: 1) his girlfriend's name is Alexis Pearlman ("Pearlman"); 2) he resided at                          CA; 3) he used the AOL instant message screen name "i0dini"; 4) his date of birth and social security number are            , respectively; and 5) he maintained Washington Mutual Bank account number

18. I obtained a copy of MEDLIN's application and photograph for United States Passport number (       issued          . On the application, MEDLIN listed his date of birth as            and social security number ?           His occupation is listed as "web advertising." Pearlman is listed on the application as an emergency contact. I also obtained a copy of MEDLIN's California driver's license, number            issued on August 8, 2001. On his driver's license, MEDLIN's date of birth is listed as

### The Money Laundering Scheme

19. In exchange for his spamming services, CW3 paid MEDLIN from proceeds derived from the sale of bootleg retail products and later, from pump and dump stock schemes. These payments were made in the form of American Eagle money orders, cash deposits, and wire transfers. CW3 told me that MEDLIN instructed CW3 to send packages containing cash and money orders to California addresses controlled by MEDLIN, his girlfriend Pearlman or, Pearlman's sister. CW3 estimated that in total, including spamming services provided in connection with the promotion of bootleg retail products and stocks, CW3 arranged for in excess of $3 million dollars to be paid to MEDLIN or, on MEDLIN's behalf. It is my knowledge and belief that MEDLIN and Pearlman were aware of the illegal source of the funds and intentionally transferred the money from the illegal spam campaigns through accounts controlled by Pearlman and her sister, Celeste, in order to disguise the source, control, and ownership of those funds.

20. As discussed previously in paragraph 10 above, CW3 provided me with photocopies of the e-mail and creative CW3 sent to MEDLIN in connection with the stock promotions involving Emerging Holdings and China Score. The e-mail header information reflects they were sent by CW3 to surrealism@runbox.com and medlin@runbox.com. These same two e-mail addresses were later used by MEDLIN to send CW3 wiring instructions for an account at Bank of America into which CW3 was instructed to deposit money. The e-mail address medlin@runbox.com also appears on a hotel guest profile created in connection with Pearlman's January 2006 through February 2006 stay at The Island Hotel, Newport Beach, California.

21. I learned that Runbox AS is a Norwegian company that provides computer e-mail service. Review of MEDLIN's Washington Mutual Bank account statement for the

5

month ending October 2004 reflects a Visa charge of $49.95 for "Runbox AS, Oslo". I determined this to be the exact price (in U.S. dollars) for a one year e-mail subscription plan offered through RunBox.

22.     Also from CW3, I received copies of Federal Express airbills covering the period of January 2004 through June 2004. CW3 told me the airbills correspond to packages containing cash and/or money orders that CW3 sent, or caused to be sent, at MEDLIN's direction, to MEDLIN, Pearlman, or Pearlman's sister. CW3 told me the cash and/or money orders represented payment for MEDLIN's spamming services in connection with several stock promotions. Several of the earlier dated airbills are addressed to "Coach McGurk" at _____ _____, _____, California. CW3 informed me that "Coach McGurk" is a cartoon character favored by MEDLIN from the television series Aqua Team Hunger Force. I determined the _____ _____ address to be a single-family residence then owned by Mark Hodges. During his October 2003 deposition, MEDLIN admitted residing at _____. Additionally, I located a copy of a check issued by Hodges dated April 28, 2004 and made payable to Alexis Pearlman in the amount of $8,106. The memo line on the check reads "security deposit." The check was deposited into Pearlman's Washington Mutual Bank account.

23.     Also included were copies of two Federal Express airbills, each dated June 18, 2004, and addressed to Alexis Pearlman at The Doubletree Hotel, Room 429, Santa Barbara, California. CW3 told me the packages contained cash and/or money orders, and represented payment for MEDLIN's spamming services in connection with stock promotions. I obtained guest records from the Double Tree Hotel (now Fess Parker's Double Tree Resort) which confirm that during the period of April 18, 2004 to June 20, 2004, Alexis Pearlman was registered in room number 429. I further determined that Pearlman's hotel charges were in part paid using MEDLIN's Washington Mutual Bank Visa credit card.

24.     I learned that on April 26, 2004, Marc Primo (a/k/a "Primo-Pulisci"), the attorney who represented MEDLIN in the AOL lawsuit, formed a Nevada company named Rntty Fnds, LLC. The company was formed through Dolphin Business Services, Inc., Las Vegas, Nevada. Franklin Roberts, an employee of Dolphin Business Services, served as resident agent and manager for the company. On May 3, 2004, Roberts opened Bank of America account number _____ in the name Rntty Fnds.

25.     Using the email address medlin@runbox.com, on June 28, 2004, MEDLIN provided CW3 wiring instructions for the Rntty Fnds account at Bank of America. Based on my review of financial records, I determined that from July 2004 through September 2004, CW3 caused a series of wire transfers totaling $540,000 to be made from an account controlled by CW3 at Independence Bank to the account of Rntty Fnds at Bank of America. Excluding the opening deposit, fees, and accrued interest, there was no other activity in the Rntty Fnds account. CW3 told me the money wired into the Rntty Fnds account represented payment for MEDLIN's spamming services in connection with stock promotions, including EMRH. The money remained in Rntty Fnds' account until April 2005, at which time a check in the amount of $250,000 made payable to Primo-Pulisci's

law firm, Initiative Legal Group LLP, was issued from the account. The check was deposited into Initiative Legal Group's account at Bank of America. In May 2005, $285,000 was wired from the Rntty Fnds to a Bank of America account in the name of Marc Primo-Pulisci.

26. A staff attorney with the SEC provided me a copy of a one-page, undated document titled "Promissory Note." The document, which purports to be a $540,000 loan agreement between MEDLIN and Rntty Fnds, LLC, was produced by attorney Primo-Pulisci in connection with a parallel SEC investigation involving stock manipulation schemes. Primo-Pulisci signed the agreement on behalf of Rntty Fnds, LLC. Terms of the alleged agreement call for Primo-Pulisci to repay to MEDLIN the principal amount of $540,000 plus interest at the rate of 9% per year. Payment is due in full on the five-year anniversary of Primo-Pulisci's receipt of the money.

27. I obtained and reviewed records related to Washington Mutual Bank account number _             in the name Justin D. MEDLIN. Beginning in February 2004 and continuing through May 2005, the address listed on account statements is _            ., California. My review further disclosed three cash deposits totaling $7,000 made to MEDLIN's account on September 13, 2004, February 25, 2005 and March 8, 2005. I determined that the deposits were made at Washington Mutual Bank branches located in Aventura, Florida or Boca Raton, Florida. CW3 told me that he/she was responsible for making these cash deposits into MEDLIN's account. CW3 informed me that the cash deposits were payments owed to MEDLIN for spamming services in connection with stock promotions. Based on my review of the bank account statements, MEDLIN used these funds for what appear to be personal living expenses, many of which were incurred while traveling abroad.

28. I also obtained and reviewed records related to Washington Mutual Bank account numbe ˉ             opened April 26, 2004 in the name Alexis Mariah Pearlman. The opening deposit consisted of a $10,000 American Eagle money order, the type I was told that CW3 had sent to MEDLIN and Pearlman. During the period of May 2004 through June 2005, a series of cash deposits totaling $73,400 were likewise made to Pearlman's account. I determined that the majority of cash deposits were made at Washington Mutual Bank branch offices located in Aventura, Florida or Boca Raton, Florida. However, several cash deposits were also made at Washington Mutual Bank branch offices located in Santa Barbara, California. CW3 told me that she/he deposited cash into Pearlman's account at the Florida bank branches. According to CW3, the money represented payment owed to MEDLIN for distributing spam e-mail in connection with stock promotions. My review of the bank account statements reflects Pearlman used these funds to pay personal living expenses, including automobile loan payments and hotel charges, many incurred while traveling abroad.

29. I learned that CW3 was directed by MEDLIN to send Federal Express packages containing cash and/or money orders to Pearlman's sister, Celeste. I reviewed Washington Mutual Bank account number             ' in the name Celeste Pearlman. For the period April 2004 through August 2004, cash deposits totaling $19,500 were

7

made to the account. Notably, in an email received from surrealism@runbox.com dated June 26, 2004, CW3 was instructed to send a "pckg" to Celeste Pearlman's Santa Barbara, California address. Bank records reveal that on June 29, 2004, a $5,000 cash deposit was made to the account. Additionally, bank statements reflect that on July 20, 2004, an additional $5,000 cash deposit was made to Pearlman's account at a Washington Mutual Bank branch in Santa Barbara, California. On August 3, 2004, Pearlman caused an inter-account transfer of $2,500 from her account to MEDLIN's account.

## Recent Developments

30.     During the period of November 2005 through May 2006, CW3 ceased communicating with MEDLIN in part due to the SEC and criminal investigations. However recently, at my direction, CW3 re-established his online relationship with MEDLIN through e-mail and instant messaging. CW3 has provided me with copies of these communications which reveal MEDLIN is anxious to resume working with CW3 by distributing spam e-mail in connection with stock promotions. Additionally, the communications reveal that MEDLIN is continuing to distribute spam e-mail in connection with the promotion of online college diplomas, Human Growth Hormone, and male virility products. I also determined that MEDLIN and Pearlman are presently residing in Paris, France. This fact is further corroborated by MEDLIN and Pearlman's recent financial records which reflect numerous transactions in France.

31.     In an effort to corroborate the fact that CW3 is communicating with MEDLIN as opposed to someone posing as MEDLIN, CW3 has elicited information which, in my opinion, only MEDLIN would know. For example, in an email to CW3 dated June 16, 2006 from surrealism@runbox.com, the two discuss monies owed to MEDLIN from prior stock deals. MEDLIN stated in part, "I need a rundown on where we stand...I remember things a bit chaotic with MO's [money orders] flying all over the place and what not." Later, during an instant message chat on July 3, 2006, MEDLIN stated in part, "because my birthday was a few days ago, Alexis made me a very [expletive] cake..." I know MEDLIN's month and day of birth i____ and that his girlfriend's name is Alexis Pearlman. Also, during the same chat, MEDLIN told CW3 in part "made a trip to California recently, and unfortunately the Pearlford (sic) got hooked on Flavor Flav's show."

32.     Travel records obtained through the Treasury Enforcement Communications System (TECS) reflect that on January 27, 2006, MEDLIN arrived at Los Angeles International Airport (LAX) on a flight from Zurich, Switzerland. At that time, MEDLIN told U.S. customs officials that he was returning from a trip to Paris, France with his girlfriend. TECS records further reflect that on March 11, 2006, MEDLIN departed LAX on a flight to Paris, France. Records obtained from The Island Hotel, Newport Beach, California, reflect that MEDLIN stayed at the hotel from January 27, 2006 through March 11, 2006 while Pearlman stayed through March 13, 2006.

8

## Conclusion

33. Based upon the forgoing, I have probable cause to believe that in or about June 2004, and continuing through in or about at least June 2005, in the Eastern District of Virginia and elsewhere, Justin Daniel MEDLIN: 1) did knowingly, in or affecting interstate or foreign commerce, a) access a protected computer without authorization, and intentionally initiate the transmission of multiple commercial electronic mail message from or through such computer, in violation of Title 18, United States Code, Section 1037(a)(1); b) use a protected computer to relay or retransmit multiple commercial electronic mail messages, with the intent to deceive or mislead recipients, or any Internet access service, as to the origin of such messages, in violation of Title 18, United States Code, Section 1037(a)(2); and c) materially falsify header information in multiple commercial electronic mail messages and intentionally initiate the transmission of such messages, in violation of Title 18, United States Code, Section 1037 (a)(3); and 2) knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, knowingly and willfully did conduct a financial transaction affecting interstate commerce which, in fact, involved the proceeds of specified unlawful activity, namely, wire fraud, in violation of Title 18, United States Code, Section 1956(a)(1)(B).

I therefore request a warrant be issued to any duly authorized Officer of the United States to arrest Justin Daniel MEDLIN.

Mark J. DiGiovanni
Postal Inspector
United States Postal Inspection Service

Subscribed and sworn to before me this 25th day of October, 2006 at Alexandria, VA.

Honorable Barry R. Poretz
United States Magistrate Judge